# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. 22-CR-161 (JDB)** |
| **JOLY GERMINE,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America hereby submits this sentencing memorandum for defendant Joly Germine (hereinafter "defendant Germine" or "Defendant"). The government requests that this Court sentence defendant Germine to life imprisonment and a special assessment of $1,700.[1] This sentence is consistent with the applicable Sentencing Guideline's recommendation of incarceration for life. The Government recommends this significant sentence to reflect the seriousness of defendant Germine's conduct. Defendant Germine led the violent Haitian gang "400 Mawozo" while in prison in Haiti, directing its members to abduct 17 victims, 16 of whom were U.S. citizens—including five children, one whom was eight months old at the time—holding most of them at gunpoint for 62 days until they escaped. This horrific crime was driven by defendant Germine's own self-interest; he wanted to secure his release from prison in exchange for the hostages. The requested sentence is sufficient, but not greater than necessary, to serve the interests of justice as codified in 18 U.S.C. § 3553(a).

---

[1] In the event that the Court does not impose a life sentence, the government asks that the Court impose supervised release for life following his term of years, pursuant to 18 U.S.C. § 3583(j).

## FACTUAL BACKGROUND

The Court presided over a ten-day trial in this matter and is well familiar with the evidence in the case. Accordingly, the Government will set out the facts only briefly.

### A. Hostage Taking Conduct

400 Mawozo is a Haitian gang and criminal organization that was founded by defendant Germine, operating in the Croix-des-Bouquets area, east of Port-au-Prince, Haiti. Beginning no later than June 2021, the Federal Bureau of Investigation ("FBI") investigated a series of hostage takings of U.S. citizens in Haiti by 400 Mawozo. 5/6/25 PM Trial Tr. 435-437 (Harrison). The victims were generally forced from their vehicles at gun point and kept in various locations by armed gang members while their relatives negotiated ransom payments for their release.

On or about October 16, 2021, at approximately 1:00 p.m., 400 Mawozo kidnapped 16 U.S. citizens and one Canadian citizen near Port-au-Prince, Haiti. 5/6/25 AM Trial Tr. 324-329 (M. Miller); 5/6/25 PM Trial Tr. 355-357 (M. Miller). The victims were part of a missionary organization, and among them were five children, including one as young as eight months old. The victims had taken a private bus to visit a local orphanage and, as they were returning, the kidnappers forced their vehicle to stop, taking control of the bus and its occupants. Shortly thereafter, 400 Mawozo claimed responsibility for the hostage taking on social media and demanded a ransom of $17 million—one million dollars for each victim. 5/6/25 PM Trial Tr. 387 (M. Miller).

On or about November 11, 2021, the hostage takers contacted a representative of the hostages and claimed that, in lieu of ransom money, 400 Mawozo wanted defendant Germine freed from his Haitian incarceration. 5/13/25 PM Trial Tr. 1669-1671 (Dugue). Although this demand

for Germine's release was not met, the hostages were all released or had escaped by on or about December 18, 2022.

Defendant Germine was 400 Mawozo's leader, and he controlled the actions of its members, even while he was incarcerated in Haiti. Defendant Germine directed 400 Mawozo's operations from prison using unmonitored cellular phones. Defendant Germine also controlled 400 Mawozo's finances, directing payments to gang members, including payment of their salaries derived from hostage ransoms. *See, e.g.*, Trial Ex. 500.B (detailing communications showing the defendant's control over the gang's finances), *attached as* Exhibit E; 5/9/25 PM Trial Tr. 1153-57, 1174 (Pelice). Defendant spoke regularly with the high-ranking 400 Mawozo members who served as his deputies—including with Lanmo Sanjou and Jean Pelice (a.k.a "Zo")—regarding the gang's kidnapping operations. Evidence adduced at trial showed that defendant Germine consulted his deputies on key dates and times during the missionaries' abduction and their period of captivity, to include (a) throughout the day on October 16, the date the missionaries were abducted, including while missionaries were being held in the circular field, (b) on days of ransom negotiations, (c) on days when hostages were released, and (d) after the escape of the remaining twelve missionaries. *See generally* Exhibit A (showing relevant phone records with defendant Germine at key times during the hostage taking); 5/9/25 PM Trial Tr. 1163-64 (Pelice describing defendant Germine's calls from jail).

400 Mawozo kept the missionaries docile and easier to guard by brandishing firearms and using threats and assurances, both of which were related to Defendant's conduct as the gang leader.

Evidenced adduced at trial, as well as in the companion matter, 21-cr-699,[2] showed that defendant Germine procured weapons for the gang from the United States, and these weapons arrived in Haiti before the missionaries were kidnapped. Trial Ex. 140 p. 27-93 (summary of evidence from Tunis's cellular phone), *attached as* Exhibit C. The missionaries and other hostages identified such weapons as being brandished by the gang. *E.g.*, 5/12/25 AM Trial Tr. at 1251, 1265 (A. Smucker). Additionally, the missionaries were told that a gang affiliate, identified by the missionaries as "Santa Claus," assured the victims that the gang did not intend to hurt them, that the gang was not trying to get money, and that, rather, the gang was using the hostages as leverage to get their leader (Defendant) out of prison. 5/6/25 PM Trial Tr. 401-402 (M. Miller). This testimony was corroborated by Defendant's own statements to gang leader Jean Pelice during the hostage taking. As Pelice later told the grand jury, defendant Germine ordered the missionaries be held in exchange for his release. 5/9/25 PM Trial Tr. 1161 (Pelice). This testimony was further corroborated by defendant Germine's text messages to his girlfriend, openly discussing hostage takings (Trial Ex. 140 p. 25-37, *attached as* Exhibit C), and by his statements after the fact to his cousin Jonas Isidor, who testified at trial (5/13/25 AM Trial Tr. 1513-45).

### B. Control of the Gang

Defendant Germine was described by multiple witnesses and himself to be the leader of 400 Mawozo, including during the relevant time period. Defendant Germine was referred to by Pelice, his girlfriend Eliande Tunis, Walder St. Louis, and himself (in messages) as the gang's

---

[2] As part of the FBI's investigation into the missionaries' hostage taking, evidence also surfaced regarding a group of U.S.-based individuals who were in contact with leaders of 400 Mawozo and were supplying the gang with firearms. Those individuals had contact with members of 400 Mawozo (including Defendant), received wire payments from various sources that originated in Haiti, and engaged in straw purchases of firearms that were smuggled or attempted to be smuggled to Haiti for delivery to 400 Mawozo. Defendant was separately charged and convicted of those crimes and sentenced to 420 months' (35 years') incarceration. 21-cr-699.

"king." *E.g.* 5/9/25 Trial Tr. at 1110 (Pelice). Pelice stated that everything defendant Germine had

was derived from the gang. Pelice and St. Louis both testified that the gang's other leader, Lanmo

Sanjou, worked for Germine. *E.g. id.* at 1199. Defendant Germine admitted that the gang members

listened to him, took direction from him, and otherwise would do what he told them to do,

including kill individuals if he instructed. For example, after the defendant was arrested by U.S.

authorities, he directed his deputy Sanjou and his cousin "Gaspiyay" to release a Dominican

hostage, and they did as he instructed, with Gaspiyay saying he would kill Sanjou if Sanjou did

not follow Defendant's orders.

Defendant Germine was already firmly in control of the gang before the missionaries were

taken hostage. At trial in 21-cr-699, Pelice testified that defendant Germine was in control of the

gang in June or July 2021, when defendant Germine struck a deal with Vitel'Homme to commit

hostage takings together and share the profits. *See U.S. v. Germine*, 21-cr-699, 1/29/2024 Trial Tr.

1422:1-1423:1; 1436:21-22. This testimony is corroborated by Germine's own statement that he

instructed the gang to release nuns taken hostage in April 2021, as well as the messages between

defendant Germine and Tunis that show Germine specifically gave directions related to hostage

takings in June and August 2021. *E.g.*, Trial Ex. 140 at 26, *attached as* Exhibit C (June 14, 2021:

Tunis asked Germine if he "had work today" and noted that "You always find something when

you go out there," an allusion to the gang's hostage taking operations.); *id.* at 27 (June 18, 2021:

Germine communicated with Tunis about being in the house of a hostage and "dragging him to

the car."); *id.* at 26 (Germine stated "we had to handle another job, we happened to find it, then

we took care of it. You already know that we do it on the spot."). Further, the messages show that,

at Tunis's request, Germine secured the release of another hostage in June 2021. *Id.* at 29.

Third, defendant Germine was in control of the proceeds of the gang's hostage takings.

Pelice testified that when ransom money was paid, it would go to defendant Germine via Santia Jean. 5/9/25 PM 1153-1154 (Pelice). Pelice specifically described how, in the summer of 2021, he transported the cash proceeds of ransom payments from Sanjou to Santia Jean, who reported back to defendant Germine. *Id.* at 1173-1174. Defendant Germine corroborated the same in his statement to law enforcement, *i.e.*, that Santia Jean was obtaining the money from Sanjou through a delivery. Trial Ex. 600.T. at p. 50 (attached as Exhibit D). Pelice also testified that Germine was fully in control of the money, keeping control of it through Santia Jean, which is corroborated by the numerous WhatsApp messages wherein Germine explains his directions to Santia Jean. *E.g.*, Trial Ex. 500.B at p. 19-20, *attached as* Exhibit E (Germine: "I'll have Santia send money tomorrow."); *id.* at p. 29 (Santia Jean: "Now I called Deco. . . I called Deco so I could ask Deco what to do or whatnot to do.").

**DEFENDANT'S LACK OF ACCEPTANCE OF RESPONSIBILITY AND CANDOR**

Defendant Germine has not accepted responsibility. Rather, he elected to proceed to trial and then testified contrary to his prior signed statement presented to the Court. In case 21-cr-699, defendant Germine pled guilty to a superseding indictment on January 31, 2024, signing and presenting the Court with a statement of offense. (Attached as Exhibit B.) With respect to Counts 35-48 of the superseding indictment in that matter, charging laundering of monetary instruments (proceeds), defendant Germine affirmed in the statement of offense as follows:

> Germine knew that some of the monies sent were the proceeds of some form of unlawful activity and he requested the funds be transferred from Haiti to the United States with the intent to promote the carrying on of specified unlawful activity, that is, the smuggling of firearms and ammunition for the United States to Haiti. **Germine knew that the property involved in the financial transactions represented included the proceeds of some form of unlawful activity, that is illegal 400 Mawozo gang activity.**

Exhibit B at 2-3 (emphasis added).

However, at trial in the instant matter (22-cr-191), defendant Germine testified that, though he had a gun purchasing business, the money that he used to buy guns was not from the 400 Mawozo gang. Government counsel confronted defendant about these statements, and defendant again denied that the money for purchasing weapons came from the 400 Mawozo gang or one of its leaders, Lanmo Sanjou. *See* 5/14/25 PM Trial Tr. at 1899 (Q. "And the gang, 400 Mawozo, sent money to you for the firearms, correct?" A. "Not at all." Q. "When you need money for weapons you got it from Lanmo Sanjou, didn't you?" A. "Absolutely not.".)

Thereafter, on redirect examination, defense counsel elicited the following exchange with defendant Germine:

Q. It's your understanding that you pled guilty to gun or weapons charges and money charges?

A. Yes. I believe all four of us pled guilty because all four of us have been charged on this case.

Q. Okay. And your business of selling guns was separate and distinct from the 400 Mawozo group?

THE COURT: You are just leading your witness.

THE DEFENDANT: Yes.

THE COURT: So why don't you ask questions that don't lead quite that much?

MR. ORENBERG: All right, Your Honor.

Q. And your business of buying and selling guns, was that an independent business?

THE DEFENDANT: Yes. I bought the guns, I sold them to the 400 Mawozo and other people as well. I do not have any relationship with the 400 Mawozo. The guns that I bought have to do with 400 Mawozo, not me.

5/14/25 PM Trial Tr. at 1913-1914.

## SENTENCING CALCULATION

### A.  STATUTORY MAXIMUM

The charge of Conspiracy to Commit Hostage Taking (Count 1), in violation of 18 U.S.C. § 1203(a), and the charge of Hostage Taking (Counts 2 through 17), in violation of 18 U.S.C. §§ 1203(a) and 2, each has a maximum penalty of life imprisonment, a fine of $250,000, or both.

### B.  SUMMARY OF SENTENCING GUIDELINES CALCULATION

Defendant Germine faces an advisory U.S. Sentencing Guidelines (USSG or Guidelines) range of life imprisonment based on his offenses of conviction. *See* ECF No. 127, Sentencing Recommendation (Aug. 22, 2025). The Government generally agrees with the calculations from the Presentence Investigation Report ("PSR") regarding defendant Germine's applicable Guidelines. *See* ECF No. 126 (Aug. 22, 2025). The Government also agrees with the grouping analysis in the PSR. *Id.* at p. 8-11. The Government also agrees with the recommendation of the PSR writer that Germine should be sentenced to the Guidelines-compliant sentence of life imprisonment and that the sentence should run concurrent to defendant Germine's sentence in 21-cr-699.

### C.  OFFENSE CONDUCT, SPECIFIC OFFENSE CHARACTERISTICS, AND ADJUSTMENTS

The offense conduct and offense characteristics that dictate the Guidelines' recommendation in this case are generally undisputed facts. At trial, undisputed evidence showed that there were five child hostages (vulnerable victims under USSG §3A1.1(b)(1)), that a ransom demand was made (USSG §2A4.1(b)(1)), that dangerous weapons, i.e., firearms, were used (USSG §2A4.1(b)(3)), and that the hostages were held for more than 30 days (USSG §2A4.1(b)(4)(A)). ECF No. 126 p. 11-23.

Additionally, as already described, the evidence at trial proved that defendant Germine was

8

an organizer and leader of the gang, that he committed the 17 charged offenses, and that the conspiracy he led had more than five participants (USSG §3B1.1(a)). In its sentencing memorandum, the defense objects to the leader/organizer enhancement. In the related case, 21-cr-699, the Court already found that defendant Germine exercised a leadership role in the gang with respect to the gun trafficking charges. The evidence in the instant matter, 22-cr-161, demonstrates that defendant Germine exercised the same role with respect to the hostage taking of the missionaries. The relevant evidence includes the grand jury testimony of Jean Pelice, which was entered into evidence at trial, and the trial testimony of Walder St. Louis and Jonas Isidor, all corroborating the defendant's leadership position.

The defense also challenges the applicability of the 2-point Obstruction of Justice enhancement (USSG §3C1.1). *See* ECF No. 126 ¶ 128. The Government submits that, as previously discussed, Defendant's statements to the jury in this matter contradicted his prior statement to the Court in accepting responsibility in case 21-cr-699. Accordingly, the enhancement is warranted. Even so, since the defendant's offense level calculation otherwise greatly exceeds the maximum allowable under the Guidelines, ECF No. 126 ¶ 186 (citing Chapter 5, Part A (comment n.2)), the additional two-point enhancement under USSG §3C1.1 has no actual impact on the Guidelines' sentencing recommendation. Specifically, with or without the Obstruction of Justice enhancement, the calculated offense level is at least 10 points (i.e., 53 or 55) above the highest Guideline score of 43. "An offense level of more than 43 is to be treated as an offense level of 43." USSG Ch. 5, Part A (comment n.2).

## SENTENCING RECOMMENDATION

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Guidelines are

"the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49. The district court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

Here, application of the § 3553(a) factors demonstrates that a Guidelines-compliant sentence of life imprisonment is appropriate.

### 1. The Nature and Circumstances of the Offense

The nature and circumstances of the significant crimes committed by defendant Germine warrant a Guidelines-compliant sentence of life in prison.

The circumstances of the crime alone are egregious: the sixteen victims were doing charity work; among the victims were five children, including an eight-month-old baby; the majority of the victims were in captivity for 62 days and held at gunpoint; the conspirators made a ransom demand of $17 million. At trial, four different hostages testified to their harrowing ordeal. Matt Miller testified that he was concerned his wife would be sexually assaulted. Rachel Miller testified

that she thought her husband was going to die in captivity. Cherilyn (Noecker) Smucker testified about her five-year-old brother being ripped out of their mother's arms. And Cherilyn and Austin Smucker testified about their efforts to escape. The fact that the calculated offense level is more than ten points above the Guidelines-allowable maximum is further indication of the seriousness of the offense.

The seriousness of the offense is magnified by the circumstances in Haiti. Defendant Germine was the leader of a violent gang that destabilized Haiti. His gang exercised near complete control over a large swath of territory that stretched from the edge of the capital of Port-au-Prince to the border with the Dominican Republic. The gang was funded through hostage takings, the profits of which defendant Germine re-invested in the gang by purchasing firearms from the United States. As the leader of the gang, the defendant caused the laundered funds to be used to purchase at least 24 semi-automatic firearms. These firearms were acquired through paperwork dependent on false statements. Defendant Germine knew that the firearms would be used for violent ends, including taking even more hostages at gunpoint, because he was directing that activity in Haiti.[3]

The gang's hostage-taking operations were a money-making business that kept the gang and defendant Germine well-financed, well-armed, and in power. This major revenue driver for the gang threatened the continued viability of Haiti's fragile national government. *See, e.g.,*

---

[3] Evidence introduced at both of defendant Germine's trials made clear that he was well aware of the destructive capacity of these weapons and the destructive purposes for which they would be used in Haiti. *See, e.g.*, 01/25/2024 Trial Tr. 1098:16-19 (St. Louis testimony that the firearms were going to 400 Mawozo and "they were also going to be used during the elections"); Govt. Ex. 140 at 62, *attached as* Exhibit C (defendant Tunis voice memo to defendant Germine noting in part: "this weapon, he told me, is a weapon that's used to go war . . ."); *id.* at 75 (defendant Germine voice memo to defendant Tunis noting in part: "They are big guns, baby, big guns" that "I can use to do a lot of bad things," and that "you can wipe out an area completely" and "you only need bullets to wipe out a whole country"); *id.* at 81 (while discussing firearms shipments in June 2021 and their frustration with the Haitian president, defendant Tunis noted that she had "two with me" and stated that she would "charge them up right now and shoot his fucking face before I leave.").

"Haitian Gang's Growing Funds, Arsenals Challenge Planned Intervention," *U.S. News & World Report,* https://www.usnews.com/news/world/articles/2024-02-13/haitian-gangs-growing-funds-arsenals-challenge-planned-intervention-report (last accessed May 22, 2024). The U.S. Sentencing Commission has recognized the seriousness of violations which threaten security or foreign policy interests of the United States. *See* § 2M5.2, Application Note 2. Here, defendant Germine's supervision and direction of the gang's hostage takings contributed to the ongoing instability in Haiti, threatening its people and government. *See, e.g.,* "U.N. Warns of Spike in Killings and Kidnappings across Haiti as Deployment of Armed Force Stalls," *AP News,* https://apnews.com/article/haiti-gangs-killed-raped-injured-a947708120e8a143d81071adb29 bf7ae (last accessed May 22, 2024).

The nature of the offenses, the status of the victims, the sophistication of the criminal activity, and the security implications all support the Government's request for a Guidelines-compliant life sentence.

### 2.  The History and Characteristics of the Offender

Defendant Germine's history and characteristics do not warrant a variance under 18 U.S.C. § 3553(a)(1) and support a Guidelines-compliant life sentence. Growing up in Haiti, the defendant completed ninth grade (PSR ¶ 212) and had relative advantages compared to others in the country (*id.* ¶ 198 (noting the relative wealth of Defendant's family)); Def.s' Sentencing Mem. 8 (noting that the defendant "received lands" as a young man and "invited farmers to grow crops" on his land); *id.* (noting the defendant's "success and influence"). Defendant Germine attained a status as a leader of the gang and amassed significant wealth for himself, to include luxury items, multiple cell phones, and free reign in prison. Even after coming to the United States, defendant Germine did not reflect on the crimes he committed, nor did he show remorse or respect for the system of

justice, as is evidenced by his testimony at trial in this matter, wherein he contradicted his own sworn statement to the Court in his prior case.

Most recently, after being convicted at trial in this case, the defendant allegedly stabbed another inmate and is being charged in D.C. Superior Court with Assault with a Dangerous Weapon; the attack was captured on security video at the jail. This is yet another indicator of the defendant's characteristics weighing against a variance and weighing in favor of a Guidelines-compliant life sentence.

### 3. The Need to Promote Respect for the Law, to Afford Adequate Deterrence, and to Protect the Public.

A Guidelines-compliant sentence provides adequate deterrence and promotes respect for the law. Defendant Germine was the leader of a powerful gang that targeted Americans for hostage takings to support the gang's destabilization efforts and, in this case, as leverage for defendant Germine's release from prison. Defendant's conduct shows a complete disregard not just for U.S. law and security, but a complete disregard for the fate of the country of Haiti and its people. A sentence that is too lenient would convey the wrong message, including to other gang leaders who remain in Haiti and continue to wreak havoc on security in the country and commit crimes against U.S. nationals. Instead, the Court should send a message to Haiti's gang leaders—and those who would support their brutal criminal schemes—that taking American citizens as hostages will be punished to the full extent of the law. A Guidelines-compliant life sentence for a notorious Haitian gang leader, under whose direction 400 Mawozo committed significant crimes impacting the Haitian people and U.S. nationals, is appropriate.

### 4. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Defendant Germine's intimate involvement in the workings of the gang and supervisory role therein justify a Guidelines-complaint life sentence. Defendant's role was generally greater than that of his hostage-taking co-defendants (only one of whom is in custody).[4] Defendant Germine was supervising the gang members in Haiti, to include Sanjou, Gaspiyay, Pelice, and the individual known as "Koleg," regarding the hostage taking. As the phone records and corroborating testimony showed, defendant Germine was unquestionably the leader in the scheme, directing the hostage taking at the relevant and important times. Defendant Germine's culpability warrants the most severe sentence.

As the "king" of 400 Mawozo, defendant Germine orchestrated the gang's hostage-taking strategy (including forming a partnership with Vitel'Homme Innocent, another notorious gang leader); he authorized the kidnapping of the missionaries; he made decisions about which hostages

---

[4] In its sentencing memorandum, the defense makes an argument about sentence disparity and lists the sentences that were imposed on the defendant's associates in connection with the *firearms smuggling conspiracy*. (Def's Sentencing Mem. at 10). The comparison to those cases is inapposite. The instant case involves hostage taking, not firearms smuggling. Those sentences are distinguishable in terms of the charges, the victims, and the leadership role of the defendant, to name just a few of the key differences. The defense also cites to two unrelated kidnapping cases from Haiti, *id.* at 12, but those cases, while horrific, involved fewer victims held for a shorter duration. In *United States v. Saint Louis,* 889 F.3d 145 (4th Cir. 2018), the defendants were convicted of holding one victim hostage for seven days and another victim hostage for four days. In *United States v. Noel*, 893 F.3d 1294 (11th Cir. 2018), the defendant was convicted of holding one victim hostage for three days. By contrast, defendant Germine was convicted for taking hostage 16 victims, including five children, and keeping the majority of them hostage for 62 days. Moreover, the evidence at trial amply demonstrated that defendant Germine's conduct was not an isolated incident. It was an ongoing criminal enterprise. Defendant Germine served as the leader of a complex and sophisticated criminal operation that controlled a large swath of territory and contributed to the destabilization of order and the reign of lawlessness in Haiti. The defendants in *United States v. Saint Louis* and *United States v. Noel* received significant sentences—240 months and 235 months, respectively. Defendant Germine's conduct was far more egregious, involving more victims over a far-longer period of captivity. Accordingly, a more significant sentence is warranted in this case.

would be released; and at a certain point he insisted that no additional hostages would be released until he was freed from prison, all while directing the actions of Sanjou, Gaspiyay, Pelice, Koleg, and others. Based on all of those aggravating factors, the Government recommends that defendant Germine be sentenced to life in prison, in accordance with the applicable Sentencing Guidelines range.

## **CONCLUSION**

Wherefore, the government recommends that defendant Germine receive a sentence of life imprisonment, lifetime supervised release, and a $1,700 special assessment.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Karen Seifert*
Karen P. W. Seifert (N.Y. Bar No. 4742342)
Thomas N. Saunders (N.Y. Bar No. 4876975)
Assistant United States Attorneys